*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-547

DERRIAN FREEMAN HARRIS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-13064-17)

(Hon. Robert A. Salerno, Motion Judge)
(Hon. Steven N. Berk, Trial Judge)

(Submitted April 9, 2020                    Decided October 7, 2021)

*William Collins*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *John Mannarino*, *Jennifer Loeb*, and *Rachel Forman*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON[*], *Associate Judge*, and RUIZ, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time the case was argued. Although Judge Thompson's term expired on Saturday, September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory

(continued…)

THOMPSON, *Associate Judge*:     On February 28, 2018, a jury convicted appellant, Derrian Freeman Harris, of possession with intent to distribute (PWID) cocaine, *see* D.C. Code § 48-904.01(a)(1) (2021 Supp.), and possession of an open container of alcohol (POCA), *see* D.C. Code §§ 25-1001(a)(1), (d) (2021 Supp.). Mr. Harris appeals on two grounds.   First, he argues that the trial judge (the Honorable Steven Berk) erred in rejecting his *Batson*[1] challenge to certain of the prosecution's peremptory strikes during jury selection.   Second, Mr. Harris argues that the court (the Honorable Robert A. Salerno) erred in denying his pre-trial motion to suppress evidence found during a search of the vehicle he had been driving.   With respect to Mr. Harris's first argument, we agree that the trial court erred by failing to sufficiently scrutinize the prosecutor's explanations for the strikes of two black women jurors.   We therefore reverse Mr. Harris's convictions. Although we think it unlikely that Mr. Harris will be retried (given that by now he

---

(…continued)
retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia court appointed on or after the date of enactment of the District of Columbia Court Reorganization Act of 1970 shall serve for a term of fifteen years, and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies.").

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that a prosecutor may not use peremptory strikes to eliminate would-be members of the petit jury on the basis of their race).

presumably has completed his sentence of incarceration) and that the suppression issue therefore will not arise again, we also briefly explain our conclusion that the vehicle search was lawful and the suppression motion was properly denied.[2]

## I. The *Batson* Issue

We start with this preliminary observation: that race is an impermissible factor in jury selection even if (as we assume here) the prosecutor was not motivated by racial animus, but instead acted on an assumption that a black woman juror, because of her race, would be favorable to a black defendant or unfavorable to the government. *Batson*, 476 U.S. at 97-98; *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241-42 (2019). We are prompted to make this observation because, during the *Batson* proceedings in the trial court, the prosecutor urged the court "to be very cautious in making findings" given that "any remedial measures that th[e] [c]ourt takes[] can ultimately be used as an adverse finding against these prosecutors." We do not know whether the trial court heeded the prosecutor's cautionary words, but we think it is worth quoting a point aptly made by another appellate court:

---

[2] We deny the pending motion for oral argument.

> [U]nder *Batson*, the issue is not racial animus but the [defendant's] right to a fair trial, including a jury selection process untainted by improper exclusion of prospective jurors based on race. The [government], like any other party to a jury trial, wants to seat a jury that will be favorable (or at least not hostile) to its case. *Batson* focuses on the *reason* the [government] believes a particular juror should not be seated, and if the juror's race is [a] reason, a violation exists despite the fact that the prosecutor does not otherwise discriminate against or harbor any animus toward that race.

*In re A.S.*, 76 N.E.3d 786, 793 (Ill. App. Ct. 2017). Relatedly, one jurist has expressed concern that "trial judges hesitate to sustain *Batson* challenges, when they otherwise might and should, because such a ruling is seen as tantamount to calling the prosecutor a racist[,]" a misconception whose "[p]erpetuation . . . allows . . . race-based strikes to go unchecked." *People v. Ojeda*, No. 15CA1517, 2019 WL 4197000, at *15 (Colo. App. Sept. 5, 2019) (Harris, J., specially concurring), *cert. granted*, No. 19SC763, 2020 WL 4915894 (Colo. Aug. 17, 2020). To the extent the "adverse[-]finding" concern the prosecutor expressed, or the court's response to it, reflected such a misconception, we think it important to endorse these other courts' remarks.

Our review of appellant's *Batson* claim begins with the recognition that if the record indicates that race was a consideration in the prosecution's decision to strike even one black juror, appellant is entitled to reversal of his convictions. *See*

*Smith v. United States*, 966 A.2d 367, 369 (D.C. 2009); *Beasley v. United States*, 219 A.3d 1011, 1016 (D.C. 2019) (explaining that excluding even one member of the venire on the basis of race would violate the Equal Protection Clause). "Our task requires careful scrutiny of the record, because we must be guided by the principle that 'race is an impermissible factor, even if a minor one, in exercising peremptory strikes.'" *Smith*, 966 A.2d at 369 (quoting *Tursio v. United States*, 634 A.2d 1205, 1213 n.7 (D.C. 1993)). To this end, we describe the *Batson* proceedings in some detail, including the prosecutor's proffered reasons for strikes, defense counsel's response, and the trial court's evaluation.

## A. Voir Dire, the Peremptory Strikes, and the Defense's *Batson* Challenge

Appellant's *Batson* challenge arose on the first day of jury selection. Following strikes for cause by the court, during which the court struck every one of the black men in the venire, thirty-seven prospective jurors remained. Of those remaining jurors, nine were black women, constituting 24% of the venire; twenty-four were white (thirteen men, eleven women), constituting 64% of the venire; and four were Hispanic (two men, two women). Each side was allotted ten peremptory strikes and one strike for selecting alternates. The defense used nine of its ten strikes, or 90%, against white jurors and also struck one Hispanic female juror.

The prosecution used five of its ten strikes, or 50%, against five of the nine black women. After reviewing the strike sheet, defense counsel asked that the prosecution put on record why these black women were struck. The trial judge allowed a break at this point for the prosecutor to go over the numbers and instructed the jury to return in fifteen minutes.

After the case was recalled, the lead prosecutor indicated that the government "may need a little bit more time." The parties and the court then proceeded to clarify the numerical breakdown of the venire following strikes for cause. After reviewing the figures, the court asked the prosecutor to provide her "non[-]discriminatory purposes." The prosecutor responded by asking the court "to make a determination whether [defense counsel] has made out a prima facie case." The prosecutor argued that defense counsel had failed to do so, noting that defense counsel had used nine of her ten strikes to strike white jurors and asserting that the court "should consider [defense counsel's] own strikes to demonstrate that there can be non[-]discriminatory aberrations in the panel."

After some exchanges between the court and the parties about how to proceed and the trial court's expression of concern about losing the jury and having to start over, the lead prosecutor noted that her supervisor was "on his way over"

and asked for a few minutes to consult with the supervisor. The court agreed to allow the prosecutor "a minute" to consult, after which the prosecutor said that she would "go ahead and put our non[-]discriminatory reasons on the record." Before proceeding to do so, however, the prosecutor again asked whether the court had made any ruling with respect to defense counsel's prima facie case. The court responded by telling defense counsel that "the numbers . . . don't get you there completely" and asking her to provide more.

In response, defense counsel referred to the "disparity" in strikes by the government (i.e., only nine black venire persons, all women, comprising 24% of remaining jurors, and the prosecution's striking five, which amounted to 50% of its strikes). Defense counsel also asserted that three of the black women did not answer "yes" to any of the court's questions and that "it just does not seem that there's any reason to strike three out of the five black women . . . other than the fact that they are black women." The prosecutor then asked "to make a record []on non[-]discriminatory reason[s] irrespective of the [c]ourt['s] decision" on the sufficiency of the prima facie case. The prosecutor went on to offer explanations for the strikes of the five black women, including the three at issue in this appeal: Jurors 214, 924, and 038.

In explaining the strike against Juror 214, the prosecutor stated that while the trial judge was reading the second charge (POCA), she (the prosecutor) "happened to be looking at [Juror 214] . . . and she made a face like come on, sort of dropped her shoulders and her hands and rolled her eyes like come on. Are we really talking about possession of an open container of alcohol?" The prosecutor said that she "noted it as soon as I saw it. It's here on my notes for myself." The prosecutor added that this juror "also indicated to us that she works at a public school system" and that jurors who "work at public schools, particularly teachers, it's just a personal preference for [the prosecution], that those are not jurors that we would choose to put on our jury, if we have a choice, and so, we elected to use a preemptory strike for her." The prosecutor then clarified that Juror 214 was not a teacher but "was an administrative assistant at the public school system." The trial court replied, "[o]kay."

Regarding Juror 924, the prosecutor explained that this juror "asked the question about the [voir dire] question . . . . I think she interrupted the [c]ourt before the [c]ourt even asked her what the question was, and she said I didn't really understand the question."[3] According to the prosecutor, "there was a lot of

---

[3] The question being referenced was the seventh question posed during voir dire: "At any time, have you, any member of your immediate family, or any close

(continued…)

discussion about the question, which . . . suggested that [Juror 924] didn't quite understand the question when it was asked" and that "she wasn't also understanding the [c]ourt's response to those questions." The prosecutor said, "that was of concern to me because I think an ability to follow the [c]ourt's instructions is really important."

The prosecutor said that Juror 924 was also "one of [] only a few jurors who . . . seemed not terribly excited about being on the jury" and that she could not remember a single other juror "who sort of suggested to me in their body language they didn't want to be here . . . . [T]he way she talked about needing to pick up her kid. She said well, you know, I don't know because I have to be able to pick up my kids . . . ." At that point, the trial judge asked, "[w]as this the 6:00 person?" The prosecutor replied, "[r]ight. And the [c]ourt said, well, what time? And she said 6:00 P.M. and you said, okay, well, you will certainly be out of here by then and her reaction to that wasn't like, oh, okay, great. That's wonderful. She was like, okay." The prosecutor explained, "that's the reason I didn't think she would be a good fit for this jury. Her inability to follow the instructions about the

---

(…continued)
personal friend ever been a victim of, arrested for, charged with, or convicted of a crime similar to the offense charged in this case?" The court re-read the question to the venire, explaining, "because it's got so many clauses in it."

questions and . . . the sense I got that she didn't want to be on the jury." The prosecutor added that her "colleague also noted that [Juror 924] was wearing a T-shirt for whatever it's worth that had an American flag on it and said land of free." The prosecutor noted, "I don't know which way that cuts one way or another . . . . It's something that gave us a little bit of pause . . . ."

Turning to the strike of Juror 038, the prosecutor explained that this juror did not have "any answers to the [c]ourt's questions, which obviously isn't unique[,]" acknowledging that "a number of panel members" also had no answers. The prosecutor further explained, "what does make her unique is . . . even when the [c]ourt said anything else, she said nope. Like she was like a closed book[,]" giving "the impression that she just wasn't really excited answering the [c]ourt's question." The prosecutor noted that her colleague "wrote down that there was a bit of a[n] attitude, like a resistance to answering the [c]ourt's question or resistance to sharing information."

The prosecutor also explained that Juror 038 was "the juror who there was confusion about which juror was supposed to come up. We actually took the older white juror, the next panel member, first and then when you called out her number, she didn't answer right away. She sat there with her arms crossed." The

prosecutor continued by saying, "[t]here [was] some confusion about whether she was here. You called out her number again. We sent that woman back. You called the number a third time and she came forward." The prosecutor also said, "the whole exchange left me with really no sense of who she is or what she's about." She added that Juror 038 "was the only panel member . . . I had literally not a single other observation about or inability to assess anything else out about. And so in our book, she was a bit of a black box." The prosecutor again mentioned that Juror 038 had "a bit of a resistance to answer questions" and said, "ultimately she was our last strike because we . . . were trying to pick the jury we knew the most about and . . . felt like was go[ing] to be fairest for the [g]overnment's case."

The court then told defense counsel, "I don't think you get to say anything at this point," but then agreed to hear from defense counsel, who said that "there were a couple of . . . difference[s] in [her] recollection as to what happened at the bench." Defense counsel asked the court whether it was "possible to look back at the transcript, specifically with respect to the woman who had the time question." Defense counsel said she did not recall Juror 924 being confused but did recall her just asking a question "about what time are we going to finish, the [c]ourt saying 6[:00] and her say[ing], oh, that child care, you know, and we all laughed and that was it." Defense counsel said, the "[g]overnment has indicated . . . that that

exchange made her think she couldn't follow directions . . . and I think it's very important that we have an accurate record of what actually took place."

The prosecutor said "it wasn't that question that I believe she had a hard time following" and that she "recall[ed] the [c]ourt began to say something and [the juror] interrupted but she was confused and so you tried to elucidate the confusion and she was still confused . . . ." The trial judge then asked defense counsel if there was "[a]nything else," to which she responded, "[n]o." The court then took a recess and reviewed case law from this court.

After the case was recalled, the court permitted defense counsel to respond further to the prosecutor's explanations. Defense counsel then explained that with respect to Juror 214, she did not believe that the prosecutor had given an adequate reason for her strike. Defense counsel explained that "[t]his individual I don't believe answered any questions on the card" and the prosecutor's indication that she was looking at Juror 214 at "the moment that the PO[]CA charge was being read, you can say that for anybody. . . . [B]ut given the fact that there are five black women who were stricken by the [g]overnment, I would argue that reason is [pretextual]."

Regarding Juror 924, the "individual that had children to pick up by 6:00[,]" defense counsel said that her recollection was that Juror 924, "did not seem confused at all. She had a question. She asked a question. The [c]ourt indicated that she would be finished in time and that was it." Defense counsel said, "[t]here was nothing that struck me about her ability to follow the [c]ourt's instructions. Again, I believe that reason is pretextual. She didn't answer any questions one way or the other[.]" The trial judge responded, "[r]ight."

Defense counsel then moved on to Juror 038, who she said, "like many people who came up, did not answer anything on her card. That wasn't unusual. In fact, I remember the [c]ourt remarking these are my favorite type of people several times." Counsel argued, "[f]or the [g]overnment to say that this is the reason, that it just seemed odd that she didn't have anything to say and that she didn't have any questions is also pretextual." Defense counsel also addressed again the prosecutor's claim that Juror 038 did not come to the bench when her number was called and said, "there was confusion among some people. She wasn't the only one." Counsel noted that "the white woman, the white juror who came up before her, came up out of turn. It was just something that was a little bit confusing to us and to some of the jurors." She explained that this did not make Juror 038 "stand out one way or the other" and that she did not believe "that that's an accurate

reason for the [g]overnment to give as to why they struck her." Defense counsel then said that with respect to the three black women who "did not indicate answers to any of the questions, I do not believe that the [g]overnment has articulated . . . race-neutral reasons that the [c]ourt should credit." Counsel asked the court to "look at the actual record with respect to whether it lines up with what the [g]overnment is recalling before mak[ing] any decision."

The court asked whether defense counsel wanted to give him "anything more," remarking that all counsel had provided "really is the numbers and the disparity" for the prima facie case and that it seemed like "a rather small sampling" and "a pretty small pool to make these conclusions about." Defense counsel repeated her disparity argument, concluding that "given the fact that there were only nine black women, I think striking five of them is rather significant out of the 37." Counsel argued that her burden to trigger the requirement that the prosecution "provide their race-neutral reason for striking these women" is not a high one.

In announcing its ruling, the court said that it had looked at and thought about the numbers; observed that "I don't think it's a[n] issue of race oftentimes"; and commented that "how people dress, the kind of jobs they have, [and] how enthusiastic they are about serving" can be "factors [that are] legitimate . . . and . . .

not a pretext." The court stated that while it had "to [be] more searching in terms of pretext regarding folks who display body language that is negative and seems to be closely held and not as excited . . . or enthusiastic about the case," concerns about such factors "are not a pretext and can oftentimes be supported."

The court concluded that the defense had not met its burden, commenting that the "disparity wasn't significant enough," noting again that "the sampling size wasn't big enough," and stating that the numbers did not "shock" the court. The court added that even if it assumed that the defense had "made out [a] prima facie case," the government "ha[d] done more than an adequate job of rebutting that case." The court said that it did not think that the jurors were struck "because of race" or that the prosecutor's proffered reasons were "a pretext."

Regarding Juror 214, the court said, "I do think that I accept [the prosecutor's] characterization of that juror making a gasp or rolling of the eyes with respect to that charge" and that the defense "may question that[,] or . . . think [the prosecutor] confused it with somebody else, but that goes to the weight of the evidence, not the evidence itself." The court added that "even if I did find that [the defense met its initial] burden, I think the [g]overnment has equally met its burden

and shown a non[-]discriminatory intent with respect to those strikes." Finally, the court said that the *Batson* motion was "not sufficient and it is denied."

## B. The Legal Framework

*Batson* and its progeny establish a multi-part process for analyzing claims of discrimination in jury selection. *Smith*, 966 A.2d at 373-74. First, the defendant must make out "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94; *Smith*, 966 A.2d at 374. The defendant's burden of establishing a prima facie case is not onerous and is satisfied by "significantly less than a preponderance of the evidence." *Robinson v. United States*, 878 A.2d 1273, 1283 (D.C. 2005).

If the defendant makes the threshold showing, the burden shifts to the prosecution "to offer race-neutral bases for the strikes." *Beasley*, 219 A.3d at 1014. The prosecutor "must offer a 'clear and reasonably specific explanation of h[er] legitimate reasons' for striking the juror in question." *Smith*, 966 A.2d at 374 (quoting *Robinson*, 878 A.2d at 1282). If the prosecution satisfies this

requirement, the burden shifts back to the defendant to prove that the proffered explanation is a pretext for discrimination. *Id*.

In the final step of the *Batson* inquiry, the trial court must determine, in light of the parties' submissions, whether the defendant has shown purposeful discrimination. *Smith*, 966 A.2d at 374; *Flowers*, 139 S. Ct. at 2243 (explaining that in criminal trials, "trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process"). The trial court's duty is to undertake a "sensitive inquiry into such circumstantial . . . evidence of intent as may be available." *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016) (internal quotation marks and citation omitted); *Batson*, 476 U.S. at 93. The trial court must assess the plausibility of the prosecutor's reason for striking a juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005). In short, the *Batson* inquiry is "supposed to be a rigorous evaluation of the credibility of the prosecutor's explanations for h[er] challenged peremptory strikes." *Robinson*, 878 A.2d at 1289.

"Greater scrutiny" of the prosecutor's race-neutral explanations is required when the case is "racially charged." *See Smith*, 966 A.2d at 376. Additionally, scrutiny of a prosecutor's explanations that center on a venireperson's body

language or demeanor is "especially important." *Id.* at 377; *cf. Batson*, 476 U.S. at 106 (Marshall, J., concurring) (explaining that a danger in peremptory challenges is that "[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically"). Explanations for peremptory challenges that "invoke a juror's demeanor (*e.g.*, nervousness, inattention), mak[e] the trial court's firsthand observations of even greater importance." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.*

"We have recognized that 'unless the trial court rigorously scrutinizes the prosecutor's race-neutral explanations, *Batson's* promise of eliminating racial discrimination in jury selection will be an empty one.'" *Smith*, 966 A.2d at 376 (quoting *Tursio*, 634 A.2d at 1211). In scrutinizing whether racial discrimination has occurred, trial courts have considered several factors. *See Flowers*, 139 S. Ct. at 2243. These factors include statistical evidence about the prosecutors' strikes; a prosecutor's disparate questioning and investigation of black and white prospective

jurors; side-by-side comparisons of black prospective jurors who were struck and white jurors who were not; a prosecutor's misrepresentation of the record when defending the strikes; and other relevant circumstances that bear on the issue of racial discrimination. *Id.*

In reviewing a *Batson* ruling claimed to be error, the reviewing court "must evaluate the government's proffered reasons for striking jurors in light of the entire record on appeal and in light of matters of common knowledge." *Smith*, 966 A.2d at 376; *see also Flowers*, 139 S. Ct. at 2244 (explaining that "an appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record"). However, because "a trial judge's *Batson* findings 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.'" *Smith*, 966 A.2d at 377 (quoting *Batson*, 476 U.S. at 98 n.21). "Thus, '[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.'" *Id.* (quoting *Snyder*, 552 U.S. at 477).

## C. Analysis

Appellant argues that the trial court clearly erred in rejecting his *Batson* challenge for two "independently reversible reasons." First, appellant argues, the

trial judge "erroneously believed that the defense had failed to make a prima facie showing of discrimination[,]" an error that "infected his final determination." Second, appellant contends, the trial judge "failed to rigorously scrutinize the government's proffered race neutral reasons" as required by *Batson*.[4] We do not discuss the first of these points at any length,[5] because we agree that the court committed clear error at stage three of the *Batson* analysis, and conclude that this error requires reversal.

---

[4] Appellant's opening brief also faults the trial judge for failing to take into account the prosecution's opportunity for research and reflection. We need not discuss that argument separately.

[5] As we explained in *Smith*, the preliminary issue of whether the defendant made a prima facie case becomes moot once a prosecutor has offered a race-neutral explanation and the trial court has ruled on the ultimate question of intentional discrimination. 966 A.2d at 377. Nevertheless, the strength of the prima facie case is "relevant in determining the strength of the race-neutral explanations necessary to rebut it[,]" *Tursio*, 634 A.2d at 1210, and thus may be pertinent to evaluations of the prosecutor's explanations for her strikes, *see Smith*, 966 A.2d at 376. Here, the level of scrutiny the trial court gave fails to pass muster without regard to the strength of the prima facie case.

As we have explained, "as the actual number of strikes used against one race deviates further from the statistically expected result, a racial consideration– intentional or not–is more likely to be the true consideration behind the strikes." *Tursio*, 634 A.2d at 1213. In this case, it is notable that the statistical disparity in this case was not as stark as in some other cases; that appellant does not challenge the prosecutor's strikes of two of the black women jurors; and that, by statistics alone, the defense's strikes — nine out of ten against white jurors (including Juror 227, who answered none of the voir dire questions affirmatively and who was asked no questions by any of the counsel) — are even more troubling than the prosecution's strikes.

*1. The Racially Charged Nature of the Case*

The trial court was apprised before jury selection began that this would be a racially charged case, the type of case that this court has said requires "[h]eightened scrutiny" of the prosecutor's peremptory strikes. *Smith*, 966 A.2d at 378. Specifically, before voir dire commenced, the prosecutor told the court that the jury would see police body-worn camera (BWC) footage of officers' stop, arrest, and search of appellant. The footage (portions of which Judge Salerno viewed during the suppression hearing, and which Judge Berk apparently viewed at least in brief part before he ruled on the *Batson* issue) shows the interaction between appellant (a young black man) and the white arresting officer, Sean Lojacono, and appellant can be heard repeatedly accusing the officer of illegally arresting and searching him. Prior to voir dire, the prosecutor described for Judge Berk appellant's reference to his race during the interaction and expressed concern that the interaction had the potential to raise skepticism among jurors. The prosecutor told the court, "[i]n this case, you have a defendant who yelled repeatedly at a high volume for over an hour about he's a black man and he knows his rights[,]" and the jury is "gonna hear and see some of that. So I'm already concerned that a jury that's already s[k]eptical of police activity is going to be even

more s[k]eptical." The prosecutor's comments evinced the anticipated relevance of appellant's race in the trial and should have alerted the court that, in this case perhaps more so than in many others, there was a danger that race could insinuate itself into the lawyers' strikes by both sides, as each side sought jurors sympathetic to their perspective.[6] *Cf. Robinson*, 878 A.2d at 1287-88 (noting that the prosecutor "openly had expressed concern about jurors who would sympathize" with the defendant, a young black male, as a salient fact about the case, and observing that this and other facts of the case "certainly d[id] not detract from the inference that the prosecutor was motivated to strike black female jurors who, on the basis of stereotypes[,] . . . might be considered most sympathetic to [the defendant], his witnesses, and his defense"). Thus, the court should have evaluated the prosecutor's explanations for her strikes with heightened scrutiny by examining each challenge in the entire context of the case and by probing the prosecutor regarding why similarly situated persons were treated differently and assessing

---

[6] The possibility that this case could be racially charged in nature was also raised by a defense motion filed on January 30, 2018, about three weeks before jury selection. Specifically, the defense requested documents related to investigations that were pending at the time regarding the officers involved in the present case, including one involving an allegation of racial profiling by Officer Lojacono, which the government had already disclosed. During trial, defense counsel elicited testimony from Officer Lojacono confirming that he was under investigation for racial profiling at the time of appellant's arrest. However, the racial profiling allegation and investigation were not discussed during the proceedings related to the *Batson* claim.

whether the differences highlighted by the prosecutor provided a "sufficient, nondiscriminatory explanation, taking into account the strength of the prima facie showing of discrimination." *Tursio*, 634 A.2d at 1212.

### 2. Juror 214

Turning to the three jurors who appellant argues were stricken for a discriminatory purpose, we are satisfied that the trial court gave adequate scrutiny to the prosecutor's explanation for her strike of Juror 214. As noted, the prosecutor explained that she had written in her contemporaneous notes an observation about Juror 214's disdainful reaction ("drop[ping] her shoulders . . . and roll[ing] her eyes") to hearing the POCA charge. The trial court expressly "accept[ed]" the prosecutor's characterization and also reasoned that the prosecutor likely would not have had time to make that notation during the brief recess in the proceedings after defense counsel made her *Batson* motion (telling the prosecutor that the court "would be really impressed . . . if you were able to concoct notes in five minutes of time to have them reflect these charges"). The court also addressed why it found the prosecutor's explanation plausible, noting the "dissent among several jurors about the . . . open can issue" across racial groups. We defer to the court's credibility determination regarding the prosecutor's explanation. *See*

*United States v. Garrison*, 849 F.2d 103, 106 (4th Cir. 1988) ("If the trial court believes the prosecutor's explanation, a reviewing court ordinarily should give this credibility finding great deference.") (internal quotation marks and citation omitted).

We acknowledge that the court misstated the prosecutor's explanation when it referred to the juror "gasp[ing]," but the error (which at least arguably reflected the court's own recollection) did not add anything of substance to the prosecutor's explanation. Defense counsel objected that the prosecutor could have "sa[id] that [explanation] for anybody[,]" but did not claim that the prosecutor could not have seen Juror 214 react in the way the prosecutor described, did not suggest that any white juror had shown the same reaction, and did not ask the court to look at the prosecutor's notes for anything suggesting that the juror's assertedly visible reaction to the POCA charge had been inserted as an afterthought.[7]

We also acknowledge that, in explaining the strike of Juror 214, the prosecutor expressed a reluctance to retain jurors who work in the public schools

---

[7] *Cf. United States v. Barnette*, 644 F.3d 192, 209-10 (4th Cir. 2011) (describing the district court's in camera review of the prosecutor's handwritten notes taken during jury selection voir dire).

(as Juror 214 told the court she did), yet did not inquire of Juror 965, a high school teacher, whether he taught in a public school. But Juror 965 had also stated at the outset that he had a sister who is a police officer, a fact, apparent on the record, that plausibly explains why the defense struck Juror 965,[8] and why the prosecutor likely found him acceptable as a juror. We cannot say that the trial court "clearly err[ed]" in rejecting the *Batson* challenge to the strike of Juror 214. *Snyder*, 552 U.S. at 477.

### 3. Jurors 924 and 038

We reach a different conclusion as to Jurors 924 and 038. For Juror 924, the prosecutor's first of three proffered explanations centered on the juror's exchange with the court about a voir dire question. The prosecutor explained that this juror had interrupted the court to ask about the question, that there was "a lot of discussion" about the question, and that the juror seemed not to understand the judge's answer. The prosecutor explained that this interaction concerned her because it raised a question about the juror's "ability to follow the [c]ourt's

---

[8] We note that the defense struck not only Juror 965, but also two other jurors who were themselves, or had close friends or relatives who were, police officers.

instructions[.]" But consistent with defense counsel's objection that the prosecutor's description differed from her recollection, our examination of the record reveals that what actually occurred was not what the prosecutor described. The discussion about the question was quite brief, and the juror (quite ably) repeated the voir dire question in its entirety in asking the court whether she had heard it correctly. The juror asked nothing further about the question and did not evince an inability to understand the question.[9] The prosecutor's misstatement of this exchange is of note because "misstatement can be another clue showing discriminatory intent." *Flowers*, 139 S. Ct. at 2250; *cf. Foster v. Chatman*, 136 S. Ct. at 1753-54 (noting that the record did not support the prosecution's assertion that a juror appeared to be confused and slow in responding to questions, and citing this as an example of how the prosecution's justifications "come undone when subjected to scrutiny"). The trial court provided no indication of whether it recalled this interaction or whether it had reviewed the record to evaluate this

---

[9] Based on our review of the transcript, it also does not appear that Juror 924 interrupted the court. However, we recognize that such an occurrence may not always be captured in the transcript. *See Williams v. United States*, 228 A.2d 846, 847 (D.C. 1967) ("We have closely studied the transcript, fully aware that it is not always possible to recapture the atmosphere of a trial from a typewritten script."); *Smith*, 966 A.2d at 384 (noting the trial court's statement that defense counsel and the prosecutor often spoke simultaneously, leaving the court reporter, when transcribing what was being said, to capture what was said by the speaker who was more persistent).

proffered explanation. As such, we cannot say that the "sensitive inquiry" required in this stage of a *Batson* analysis was conducted. *Batson*, 476 U.S. at 93.

The prosecutor's second explanation for striking Juror 924 pointed to the way the juror, speaking about needing to pick up her child, gave an unenthusiastic, one-word reaction ("okay") when the trial judge told her that court would recess by 4:45 p.m.[10] Even after defense counsel interjected that Juror 924 had actually responded to the exchange with a comment (about late fees) that prompted everyone to laugh, the trial judge asked no questions to probe the verity of the prosecutor's proffered explanation about Juror 924's terse answer to the court's response about when the court would recess.

This was so even though a side-by-side comparison of Juror 924 and Juror 395 called for skepticism about the prosecutor's proffered explanation regarding

---

[10] The prosecutor also explicitly invoked the juror's body language, explaining that Juror 924 was one of only a few jurors who did not seem "terribly excited" about being on the jury, and saying that she could not remember a single other juror who indicated "in their body language they didn't want to be here." The trial judge noted that explanations based on body language or demeanor must be closely scrutinized, but asked no questions regarding the "body language" explanation and did not provide its own observations regarding the juror. Nevertheless, we do not rely on body language as a basis for finding a *Batson* violation because defense counsel did not rebut the prosecutor's body language explanation.

Juror 924's terse response and lack of excitement. *See Miller-El v. Dretke*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination."). Juror 395, a white male, was not struck by the prosecution even though he, too, asked about the duration of the proceedings. He first asked, "so the [] trial should be over by next Tuesday; right?" Pressing the issue further, he then asked, "[y]ou think it will be going through Thursday or Friday, Your Honor?" His answer each time to the court's response was — similar to the prosecutor's recollection of Juror 924's answer — a simple "[o]kay." Though Juror 395 asked more questions related to the timing of the proceedings than Juror 924 had and responded tersely to the judge's assurances with a simple "okay," the prosecutor did not express concern about his excitement or lack thereof, and did not strike him. "[P]roper analysis of [the] *Batson* claim require[d] that [the trial] court engage in [such a] comparative juror analysis." *United States v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011); *cf. Snyder*, 552 U.S. at 484 (noting that if the prosecutor had been "sincerely concerned" that a stricken black juror's commitments would prompt him to shorten the trial, it was hard to see why the prosecutor would not have had at least as much concern regarding a white juror with pressing commitments who had not been struck).

In providing her third reason for striking Juror 924, the prosecutor said that her colleague had noted that the juror was wearing a t-shirt "for whatever it's worth that had an American flag on it and said land of the free." The prosecutor then said, "I don't know which way that cuts one way or another." This may have been a race-neutral explanation that did not implicate equal protection. But given the racially charged nature of the case, we think it was incumbent on the trial court to ask questions geared at determining whether the explanation might have reflected a race-related interpretation of how the message on the T-shirt could "cut." In sum, we conclude that the trial judge did not engage in the requisite scrutiny of the prosecutor's explanations for the strike of Juror 924.

As described above, the first of the prosecutor's two proffered explanations for striking Juror 038 centered on her body language and demeanor. Like some others in the venire, this juror did not have any "yes" responses to the court's voir dire questions. According to the prosecutor, what made the juror "unique" is that when the court said "anything else[?]," she said "nope" as if she were "a closed book" and gave "the impression that she just wasn't really excited answering the [c]ourt's question." The prosecutor also stated that the juror exhibited "a bit of a[n] attitude" or "a resistance to . . . sharing information." The prosecutor said that

she was left with "really no sense of who [Juror 038] is or what she's about" and noted that this juror was the only panel member about whom she "had literally not a single other observation"; in the prosecutor's "book, [Juror 038] was a bit of a black box."

The record does not support the prosecutor's assertions. Instead of simply saying "nope" when the court asked whether she had any questions, Juror 038 provided a more fulsome response, saying, "[n]o. I didn't have any problems with the questions you were asking." She also confirmed with the trial judge that she would have time to get something to eat before the designated return time, demonstrating a more engaged interaction with the court than the prosecutor had suggested. And while striking a juror about whom little to nothing is known is "a rationale with some basis in accepted trial strategy," *People v. Hecker*, 942 N.E.2d 248, 269 (N.Y. 2010) (brackets, internal quotation marks, and citation omitted), neither the prosecutor nor defense counsel asked Juror 038 any questions, so there is no record support for the claim that she was resistant to sharing information. Finally, the trial court did not provide on the record any impression of Juror 038 corroborating the prosecutor's assessment.

Further, a side-by-side comparison would have cast doubt on the prosecutor's first explanation. Juror 227, a white male, had an even shorter exchange with the court during voir dire than Juror 038 had. After noting that Juror 227 had not marked "yes" to any questions, the trial court asked the juror whether he had any questions. Juror 227 simply replied, "[n]o." After neither party opted to ask this juror a question, the trial judge told the juror what time to return to the courtroom, with no further response from the juror. Despite the brevity of this exchange, the prosecutor did not strike Juror 227 for revealing nothing about himself.

In her second proffered explanation about Juror 038, the prosecutor pointed to "confusion about which juror was supposed to come up" to the bench. The prosecutor explained that when Juror 038's number was called, "she didn't answer right away[,]" but sat with "her arms crossed." The trial court did not indicate whether it recalled the "confusion" the prosecutor attributed to this juror. From the record, however, it appears that confusion — on the part of venire persons and the trial judge as well — about who should sit where and who had been called up to the bench — arose several times (with the deputy clerk at one point asking a whole row of jurors to exit their seats because some people had "[gone] in wrong"). With respect to Juror 038 in particular, the record seems to indicate that the deputy clerk

and the trial judge may have confused her with two other jurors (Juror 060 and possibly Juror 540). Moreover, contrary to the prosecutor's recollection, the record indicates that when the deputy clerk directly asked "[w]ho is 038?[,]" Juror 038 stepped forward and the court proceeded with voir dire. In any case, as the government acknowledges in its brief, it is unclear whether this explanation was an actual reason for the strike.

In ruling on the *Batson* motion, the trial court observed that concerns about "how enthusiastic [individuals] are about serving" and about body language and demeanor can be "legitimate" rather than pretextual and "can oftentimes be supported." Those observations are true enough, but were no substitutes for the "rigorous evaluation" and "probing inquiry" of the prosecutor's explanations that the court was obliged to undertake. *Robinson*, 878 A.2d at 1289. Though the trial court is "not required to make detailed findings of fact or to give a detailed explanation following a *Batson* challenge[,]" *Johnson v. United States*, 107 A.3d 1107, 1113 (D.C. 2015), it must engage in the "closest possible scrutiny" of the proffered explanations, *Jefferson v. United States*, 631 A.2d 13, 15 (D.C. 1993) ("An assertion by counsel that the government is acting in a racially discriminatory manner is very serious and demands the closest possible scrutiny by both the trial court and this court.").

For all the foregoing reasons, we agree with appellant that the court erred in denying his *Batson* challenge. In the entire context of the case — the anticipation of certain racially charged evidence and the prosecution's striking of five out of nine African-American jurors — a more probing inquiry of the prosecutor's proffered explanations for her strikes of jurors 924 and 038 was required.

*4. Reversal is Necessary*

We conclude that reversal, rather than remand for the court to conduct the required scrutiny, is the appropriate remedy in this case. That is because the government's reasons, focused in large part on prospective jurors' attitudes and lack of enthusiasm, were proffered so long (over three years) ago that they cannot now be meaningfully tested. *See Haney v. United States*, 206 A.3d 854, 864 (2019) (noting that appellant's trial occurred over two years ago and the reasons for specific strikes were not corroborated by contemporaneous evidence in the record); *Robinson*, 878 A.2d at 1290 (explaining that over time, it becomes difficult for the court and counsel to recreate the circumstances of each strike or even to remember individual jurors).

## II. The Suppression Motion

We now turn briefly to appellant's challenge to the trial court's denial of his suppression motion. Appellant sought to preclude the government from introducing evidence of the razor blade and digital scale (inferentially, evidence of intent to distribute), which officers found when they searched the vehicle appellant had been driving; a photo of a can of beer found in the trunk (some corroboration of the POCA charge); and statements appellant made after his formal arrest, which he contends were a fruit of the illegal search. The parties agree that the trial court erred in finding that the search of the vehicle was lawful under the so-called first prong of *Arizona v. Gant*, 556 U.S. 332 (2009), as both appellant and appellant's girlfriend, Alexis Carpenter, were handcuffed at the time the search began and could no longer access the vehicle.[11] Appellant contends that the vehicle search

---

[11] *Gant*'s first prong permits police to search a vehicle incident to a recent occupant's arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 343; *id.* at 339 (explaining that if there is no possibility that an arrestee could reach into the area the police seek to search, the first prong does not apply); *see also Dawkins v. United States*, 987 A.2d 470, 476 (D.C. 2010) (concluding that the first prong of *Gant* did not provide a basis to search a car incident to arrest because the car was locked and appellant was handcuffed when he was arrested).

also was not justified under the second prong of *Gant*. We conclude that both the second prong of *Gant* and the automobile exception justified the search of the vehicle.

At the February 15, 2018, suppression hearing, Officer Lojacono, who at the time of his encounter with appellant was assigned to the Metropolitan Police Department Narcotics and Special Investigations Division, testified that on July 29, 2017, at around 2 p.m., he and two fellow officers, Kevin VanHook and Ramon Moe, were patrolling the 600 block of Newton Place, N.W., in an unmarked vehicle, when they saw appellant and a second person, later identified as Jeffrey Jordan, standing near a parked vehicle, and saw appellant pass what appeared to be an already-opened can of beer to Mr. Jordan. The beer exchange was not captured on the officers' BWC footage, which was played at the hearing, but the footage does show that when Officer Lojacono exited the police vehicle, Mr. Jordan was in the midst of pouring out the contents of the can. Officer Lojacono approached the two men and asked appellant whether he had anything on him. Appellant answered "no" but asked what he was being "checked for." Officer Lojacono replied, "well, you guys are drinking out here." Officer Lojacono testified that the liquid that had been poured from the can "smell[ed] consistent with beer[,] which I know contains alcohol."

Officer Lojacono then walked up to the vehicle near which appellant was standing, looked into the car, saw Ms. Carpenter "attempting to secrete a large amount of marijuana underneath the seat[,]" and remarked to appellant, "you got quite a bit of weed in the car." Appellant responded that "[i]t's two people," referred to "our weed," and said that the weed "belonged to both him and her," an explanation that Officer Lojacono "assume[d] was [offered] to state that it was under the legal amount." The BWC footage shows that at about the same time, Ms. Carpenter, who had been seated in the front passenger seat, exited the vehicle, closed the door, and remotely locked the vehicle. As Officer Lojacono attempted to handcuff Ms. Carpenter, appellant approached, but Officer Lojacono told him to "back up" and Officer Van Hook handcuffed appellant and told him he was being detained.

Officer Lojacono testified that the weed he saw in the car was in a large bag that contained three or four smaller bags. He told the court that after seeing "how much [the weed] was, through [his] experience, [he] believed it was well over two ounces." After handcuffing Ms. Carpenter, Officer Lojacono removed the vehicle keys from her pocket and opened the front passenger door. He then reached under the front passenger seat and retrieved one small bag and one large bag of

marijuana. Officer Lojacono also found a digital scale in the front passenger side door pocket, a small razor blade in the rear driver's side door pocket, and an unopened beer can in the trunk.

Officer Lojacono weighed the two bags of marijuana on a digital scale retrieved from the trunk of the police car and found that, together, the bags weighed 2.3 ounces. Officer Lojacono then approached appellant and proceeded to search him and at one point asked appellant "what's that?" after detecting a "large rock-like substance" in his groin area. When Officer Lojacono attempted to search appellant's groin area from behind, appellant began yelling for help and accused the officers of illegally searching him and raping him. The officers eventually transported appellant to the Fourth District Police Station, where Officer Lojacono removed a rock of crack cocaine from appellant's underwear.

In denying the suppression motion, the trial court ruled that that there was reasonable articulable suspicion for the stop given the officers' testimony about seeing appellant pass the beer can to Mr. Jordan. Citing the testimony that "the person to whom the beer was given did not make any movements that appeared to be the opening of a closed container of the beer that the defendant had just passed to him[,]" the court also found that the officers had probable cause to arrest

appellant for POCA and that the search of appellant was valid incident to his arrest. Finally, the court found that the vehicle search was valid under *Gant*.

## A. Legal Framework

The standard of review for a trial court's ruling on a motion to suppress requires that the facts and all reasonable inferences therefrom be viewed in favor of sustaining the trial court's ruling. *Dawkins*, 987 A.2d at 473. Factual findings will not be disturbed if supported by substantial evidence. *Id.* at 473-74. However, conclusions of law are reviewed de novo. *Id.* at 474.

"A search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (citation omitted). The two exceptions relevant to this appeal are the *Gant* evidence search (also known as the *Gant* second prong) and the automobile exception. *Gant*'s second prong permits police to search a vehicle if:

> (a) the police have probable cause to arrest the suspect for an offense; (b) the suspect recently occupied a vehicle; (c) the police have reasonable, articulable suspicion to believe that the vehicle contains evidence of the offense; (d) at the time of the search, the police have

not released the suspect or issued the suspect a citation for the offense; and (e) the suspect's formal arrest for the offense follows quickly on the heels of the search.

*Lewis*, 147 A.3d at 239–40; *see Gant*, 556 U.S. at 343, 351.

Under the automobile exception to the warrant requirement, police may search a vehicle if there is probable cause to believe the vehicle contains evidence of criminal activity. *Gant*, 556 U.S. at 347. Unlike the *Gant* evidence-search exception, the automobile exception "allows searches for evidence relevant to offenses other than the offense of arrest." *Id.* Additionally, the "scope of the search authorized is broader." *Id.*

## B. Analysis

Viewing the facts and all reasonable inferences in favor of sustaining the trial court's ruling, we conclude that, before the vehicle search, probable cause existed to arrest Ms. Carpenter for possession of an amount of marijuana that was unlawful to possess, which in turn justified the search of the vehicle under *Gant*'s "reasonable to believe" second prong.[12] *See Gant*, 556 U.S. at 351; *Butler*, 102

---

[12] We need not reach some of the issues appellant raises, such as whether the officers had probable cause to arrest him for public consumption of marijuana.

A.3d 736, 741 (D.C. 2014) (explaining that the inquiry for probable cause to arrest is whether the facts and circumstances within a police officer's knowledge are sufficient to warrant a prudent officer in believing that a suspect had committed or was committing an offense); *Gant*, 556 U.S. at 344 (noting that in some cases, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein"). Officer Lojacono's testimony was that at the time of the arrest, he was in the Narcotics Enforcement Unit, and that based on his experience ("many cases"), he believed the amount of marijuana he saw Ms. Carpenter trying to hide in the car exceeded two ounces. In addition, not only did Ms. Carpenter try to secrete the marijuana (to keep it safe, appellant suggests), but she also locked the car door, even though she remained nearby, permitting the officer to infer that she did not want the officers to examine the marijuana.[13] Further, appellant's statement that the marijuana belonged to both him and Ms. Carpenter supported an inference that appellant knew that the amount

---

[13] The possibility that Ms. Carpenter's behavior could have innocent explanations did not undermine probable cause. *See, e.g., Tobias v. United States*, 375 A.2d 491, 494 (D.C. 1977) (noting that even if there might have been "innocent explanations for appellant's conduct, it is not necessary that all innocent explanations for a person's actions be absent before those actions can provide probable cause for an arrest").

exceeded the amount that was permissible for one individual to possess.[14] From all the foregoing, Officer Lojacono could reasonably believe that there was a fair probability that the amount of marijuana he saw in the car exceeded the legally permissible amount. *See Jenkins v. District of Columbia*, 223 A.3d 884, 890 (D.C. 2020) (explaining that probable cause requires only a fair probability of a crime, which is less than a preponderance of the evidence).

For essentially the same reasons, we also conclude that the search was valid under the automobile exception. Though the trial court did not rely on this exception, it is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court. *See Alston v. United States*, 518 A.2d 439, 440 n.2 (D.C. 1986). As noted earlier, the automobile exception allows officers to search a vehicle without a warrant, so long as there is probable cause to believe the vehicle contains contraband. *See West v. United States*, 100 A.3d 1076, 1084 (D.C. 2014). Once Officer Lojacono observed the marijuana, which he believed based on his experience weighed more than two ounces, saw Ms. Carpenter move to conceal the marijuana under her seat, watched her quickly exit

---

[14] Officer Lojacono was not required to believe appellant's claim that some of the marijuana belonged to him and some belonged to Carpenter. Appellant acknowledges that "[t]he natural way to interpret this statement was as an attempt to exonerate Ms. Carpenter by asserting possession and control over part of the marijuana[.]"

the vehicle and lock it as he approached her side of the car, and heard appellant's statement about ownership by him and Carpenter, he had reason to believe that the car contained evidence of criminal activity. We therefore affirm the trial court's denial of appellant's motion to suppress.

### III. Conclusion

For the foregoing reasons relating to appellant's *Batson* claim, we reverse appellant's convictions and remand for further proceedings consistent with this opinion. We affirm the denial of the motion to suppress evidence obtained during the search of the vehicle.

*So ordered.*