*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CO-0289 & 20-CF-0190

GLENN ARTHUR SMITH, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2011-CF1-013068)

(Hon. Thomas Motley, Trial Judge)

(Argued En Banc January 23, 2025     Decided January 29, 2026)

*Sean R. Day* for appellant.

*Stefanie Schneider*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief as amicus curiae in support of appellant.

*Adam Murphy*, NAACP Legal Defense & Educational Fund, Inc., with whom *Michele St. Julien* and *Devin McCowan*, NAACP Legal Defense & Educational Fund, Inc., were on brief as amicus curiae in support of appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, *Bridget M. Fitzpatrick*, Principal Assistant United States Attorney, *Elizabeth H. Danello*, and *Amy H. Zubrensky*, Assistant United States Attorneys, were on brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH, EASTERLY,

DEAHL, HOWARD, and SHANKER *Associate Judge*s.[*]

Opinion for the unanimous court by *Associate Judge* BECKWITH.

BECKWITH, *Associate Judge*: After the government used its peremptory strikes to remove every nonwhite prospective juror from the venire, an all white jury convicted Glenn Arthur Smith, Jr., a Black man, of sexually assaulting a white woman. On appeal Mr. Smith argues, among other things, that the trial court erred in rejecting his challenge to the prosecutor's removal of nonwhite jurors under *Batson v. Kentucky*, 476 U.S. 79, 87 (1986), in which the Supreme Court of the United States held that a prosecutor's peremptory strike of a juror solely on the basis of her race violated the Equal Protection Clause of the Fourteenth Amendment. A division of this court affirmed Mr. Smith's convictions, concluding that the trial court had adequately scrutinized the government's proffered reasons for the strikes and that those reasons, credited by the trial court, satisfied *Batson*. *Smith v. United States*, 288 A.3d 766, 778 (D.C. 2023). This court then granted Mr. Smith's request for en banc review of the division's holding and vacated the panel's opinion and judgment. After receiving further briefing and hearing argument from the parties, the en banc court now holds that the trial court's *Batson* analysis was insufficient and that the government's strike of at least one juror was more likely than not racially

---

[*] Associate Judge McLeese did not participate in the consideration or decision of this appeal.

discriminatory. Accordingly, we reverse Mr. Smith's convictions and remand for a new trial.

## I.     Factual Background

Mr. Smith was charged with two counts of first-degree sexual abuse and one count of attempted robbery stemming from allegations that he sexually assaulted a woman as she was walking home from a party. Before trial, in providing notice of his intent to present expert testimony that the complainant's injuries were more consistent with preexisting conditions than forcible sexual intercourse, Mr. Smith revealed that his defense theory would be that the complainant had consented to sex with him.

The jury venire for Mr. Smith's trial initially consisted of thirty-six qualified potential jurors: Thirty were white, four were Black, one was Asian, and one was Hispanic. After the parties took turns making peremptory strikes, Mr. Smith objected to the government's strikes on *Batson* grounds, noting that the government had used six of its eleven peremptory strikes to eliminate all of the nonwhite jurors. In response, the trial court first questioned whether Mr. Smith had established a "prima facie" case under *Batson*—that is, whether he had made a sufficient showing that the strikes appeared at first impression to be racially motivated—and expressed skepticism that it could consider "all together" the strikes of jurors of three different

races[2] (Asian, Hispanic, and Black) in making that determination. Defense counsel countered that the government's striking of "just the four [Black] individuals" in itself made out a prima facie case of racial discrimination sufficient to trigger *Batson* scrutiny.

The government disagreed that Mr. Smith had made a prima facie case but nonetheless proffered what it purported to be race-neutral reasons for its strikes of the four Black prospective jurors. Specifically, the prosecutor said that she struck Juror 238—a plumber's assistant—because someone in the plumbing profession would not "be able to understand the scientific testimony." She offered the same reason for striking Juror 254—a cashier and breakfast attendant—while adding that the juror had held the cashier job for only ninety days and that the juror's clothing "was very disrespectful to the Court." The prosecutor said she struck Juror 683—a Department of Public Works (DPW) employee—because he had incorrectly answered "yes" to the judge's question whether he had ever "worked for any local,

---

[2] While "Hispanic" is "best described as [an] ethnic categor[y], . . . [o]ther courts have described bias against Hispanic defendants as racial, ethnic, or cultural bias without giving much import to the specific label adopted," *see Machado v. United States*, 325 A.3d 352, 355 n.6 (D.C. 2024), and the Supreme Court has described "Hispanic" as a "racial classification[]" in the *Batson* context, *see Flowers v. Mississippi*, 588 U.S. 284, 299-300 (2019); *see also, e.g.*, *United States v. Alvarez-Ulloa*, 784 F.3d 558, 566 (9th Cir. 2015) (concluding that the defendant established a prima facie case that strikes of Hispanic jurors were "based on purposeful racial discrimination").

state or federal prosecutor's office" or "any local, state or federal Court system." In the prosecutor's view, the juror's apparent mistake in thinking the question was more broadly about employment with any local, state, or federal government "was not showing a level of understanding of even that fairly basic question." Finally, the prosecutor stated that she struck Juror 721—an alternate juror and information technology marketing professional—because doing so would bring into "the number one position" a different juror whom the government "just preferred." Defense counsel objected to these proffered reasons as being illogical and therefore likely pretextual, characterizing two of the strikes as unfairly eliminating the Black plumber's assistant and Black cashier on the assumption that they were "too unintelligent to serve on a jury."

With the exception of the reason given for striking Juror 238 (the Black plumber's assistant), which the trial court never specifically addressed, the court considered the strikes of the other three Black jurors and accepted the sincerity of, and legal sufficiency of, the government's explanation for each strike.[3] First, as to

---

[3] Because defense counsel was prompted by the trial court to narrow the *Batson* challenge to "just the four" Black prospective jurors, the government was never required to give—and the trial court never addressed the sincerity of—race-neutral reasons for its strikes of the Asian and Hispanic prospective jurors. On appeal, the government suggests that such race-neutral reasons may well have existed, *see* Second Corrected En Banc Consolidated Brief of Appellee at 69 ("Nor is it self-evident on the existing record that the government lacked legitimate, race-

Juror 721 (the alternate), after the court asked the government whether there was any "basis for striking the alternate . . . except [that government counsel] wanted the other alternate," the government withdrew the strike and defense counsel agreed that Mr. Smith was not objecting to this withdrawal. The court next concluded that defense counsel "ha[d] to admit that . . . the Government had a basis for striking" Juror 683 (the DPW employee) because that man "did not understand or fully understand the nature of the Court's questions." As for Juror 254 (the Black cashier), the court noted only that it was "a race neutral reason" that she "had the job for 90 days."

In response, defense counsel acknowledged that some of the government's proffered reasons might appear race neutral when considered in isolation but asked the court "to look at the totality of the selections" in determining whether, in the aggregate, they were more likely than not to be race neutral. The court declined to consider the strikes in the aggregate, apparently construing defense counsel's argument as being about the sufficiency of the total number of nonwhite jurors rather

---

neutral reasons to strike them."), and offers potential race-neutral reasons, *see id.* ("The Hispanic juror was employed as a café server and attended a for-profit technical school instead of college; the Asian-American juror apparently could be heard by the trial judge only with difficulty, English was not her primary language, and she was a retired housekeeper."). Given that Mr. Smith has made out a prima facie *Batson* claim based on the four struck Black jurors, we need not address whether he also may have a *Batson* claim with respect to the other two nonwhite jurors.

than about the need to consider the strikes as a group in determining their race neutrality. Trial Tr. 133-35, Dec. 4, 2012 (stating that the law did not require courts "to guarantee a certain number of blacks that would be on the jury" and that such an approach would turn any strike of any Black person into a prima facie case). In the end, the trial court "accept[ed] the Government's representation" for each strike as "credible" and "not based on race." It therefore rejected Mr. Smith's *Batson* challenge. At the conclusion of the trial, the jury acquitted Mr. Smith of attempted robbery but found him guilty of both sexual abuse counts.

## II. The *Batson* Framework

Peremptorily striking a juror based on race is unconstitutional. "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 588 U.S. 284, 301 (2019). "[R]acial discrimination in jury selection compromises the [defendant's] right of trial by impartial jury," *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 237 (2005), and can cause "profound personal humiliation" to the excluded juror who has "the right not to be excluded . . . on account of race," *Powers v. Ohio*, 499 U.S. 400, 409, 413 (1991). Indeed, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson*, 476 U.S. at 87. "[T]he very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality[]' and

undermines public confidence in adjudication." *Miller-El II*, 545 U.S. at 238 (quoting *Powers*, 499 U.S. at 412). Accordingly, the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)).

Notwithstanding the broad recognition of these core principles, courts have had notorious difficulty determining when a strike is truly based on race, given the unfortunate ease with which parties can proffer a pretextual race-neutral reason for a strike. *See, e.g.*, *Miller-El II*, 545 U.S. at 267 (Breyer, J., concurring) (noting the recurring "practical problems of proof" in analyzing *Batson* claims). Acknowledging these difficulties, the Supreme Court has underscored that its "cases have vigorously enforced and reinforced the [*Batson*] decision, and guarded against any backsliding" by broadly construing—and extending—*Batson*'s protections at each opportunity to do so. *Flowers*, 588 U.S. at 301.

With these challenges in mind, the Supreme Court has prescribed a three-part *Batson* framework designed to ensure thorough scrutiny of potentially pretextual race-neutral reasons for strikes. The first step in the framework requires the party challenging a strike to establish a "prima facie showing that a peremptory challenge has been exercised on the basis of race." *Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 328 (2003). This is not an onerous requirement: The challenging party

must simply show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93-94). Second, once a prima facie case has been established, the burden shifts to the proponent of the strike to "'explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Id.* (quoting *Batson*, 476 U.S. at 94). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation," and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). Third, the trial court must decide whether the proffered reasons for the strike "were the actual reasons or instead were a pretext for discrimination." *Flowers*, 588 U.S. at 298. If, with "the benefit of all relevant circumstances," the trial court decides that "it was more likely than not that the challenge was improperly motivated," *Johnson*, 545 U.S. at 170, the court must either "discharge[] the venire and select[] a new jury from a panel not previously associated with the case" or "cancel[] the discriminatory strikes and resum[e] jury selection with the improperly stricken jurors reinstated on the jury," *Epps v. United States*, 683 A.2d 749, 754 (D.C. 1996) (citing *Batson*, 476 U.S. at 99 n.24).

Like a trial court's *Batson* analysis, our appellate review of the trial court's reasoning in rejecting a *Batson* challenge also "must evaluate the government's

proffered reasons for striking jurors in light of the entire record on appeal and in light of matters of common knowledge." *Harris v. United States*, 260 A.3d 663, 675 (D.C. 2021) (quoting *(Edwin) Smith v. United States*, 966 A.2d 367, 376 (D.C. 2009)) (citing *Flowers*, 588 U.S. at 303). We review de novo whether the trial court correctly interpreted and applied the *Batson* framework. *See Melbourne v. Taylor*, 147 A.3d 1151, 1154 (D.C. 2016) ("The appropriateness of the legal standard applied by the trial court is ordinarily reviewed de novo by this court.").

Here, the parties appear to agree that the question before us—whether the trial court considered the correct factors in step three of its *Batson* analysis—is indeed a legal one, but they disagree on what the trial court's burden at that step is. The government argues that the trial court need only scrutinize the strikes based on factors specifically raised by the challenging party at the trial level. Here, Mr. Smith did argue below that the trial court should consider the strikes in the aggregate rather than each in isolation, but did not explicitly argue until appeal that the trial court's analysis also failed in other respects—for example, in not considering the racially charged nature of the case and in not making side-by-side comparisons of struck white and nonwhite jurors. Mr. Smith argues that our review is not so limited, given that the issue on appeal is broadly that "the trial court failed to apply the correct legal analysis" when it declined "to scrutinize, much less rigorously scrutinize, the government's stated reasons." The trial court went astray, according to Mr. Smith,

when it "cordially accepted" the government's reasons "at face value" rather than considering all relevant circumstances and using common sense in determining whether those reasons were likely pretextual.

On this question, the Supreme Court is clear that a trial court's duty at step three of *Batson* is broader than the government suggests. Because *Batson* safeguards not merely the rights of the parties but the rights of jurors themselves, trial courts "are under an affirmative duty to enforce the strong statutory and constitutional policies embodied" in *Batson*. *Powers*, 499 U.S. at 416; *see also Flowers*, 588 U.S. at 302 ("[T]rial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process."). Specifically, the Court has admonished trial judges to determine, "in light of all of the relevant facts and circumstances," whether the prosecutor's proffered reasons for the challenged strikes are pretextual, *Flowers*, 288 U.S. at 302, by conducting "a sensitive inquiry into such circumstantial . . . evidence of intent as may be available," *Foster v. Chatman*, 578 U.S. 488, 501 (2016) (alteration in original) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). The relevant factors courts must consider, where available, include statistics about the strikes, examples "of a prosecutor's disparate questioning . . . of black and white prospective jurors[,] . . . side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck," *Flowers*, 588 U.S.

at 302, the racially charged nature of the case,[4] and the prosecutor's credibility, often evaluated by "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy," *Miller-El I*, 537 U.S. at 339.

In short, while "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike," *Purkett v. Elem*, 514 U.S. 765, 768 (1995), the trial court retains the affirmative duty to "assess the plausibility" of the government's proffered reasons "in light of all evidence with a bearing on it," whether or not the opponent of the strike has directed the trial court's

---

[4] *Cf. Powers*, 499 U.S. at 412, 416 (noting that "race prejudice stems from various causes, and may manifest itself in different forms," depending on the nature of the case); *see also State v. Cuthbertson*, 886 S.E.2d 882, 895 (N.C. Ct. App. 2023) (holding that "[t]he race of the defendant, the victims, and the key witnesses bears upon this determination" (quoting *State v. Bennett*, 871 S.E.2d 831, 856 (N.C. Ct. App. 2022))); *State v. Davis*, 894 S.W.2d 703, 707 (Mo. Ct. App. 1995) (listing as factors the trial court should consider "the conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses"). While a case's racially charged nature is a significant factor within the totality-of-the-circumstances analysis at step three, it does not—contrary to Mr. Smith's contention and notwithstanding statements in our previous cases—trigger a heightened level of scrutiny. *See Harris v. United States*, 260 A.3d 663, 676 (D.C. 2021); *Smith*, 966 A.2d at 378; *Tursio v. United States*, 634 A.2d 1205, 1211-12 (D.C. 1993). We clarify today that the rights that *Batson* is designed to protect are so fundamental that the trial court must conduct a "rigorous evaluation of . . . the prosecutor's explanations for his challenged peremptory strikes" in *every* case—whether racially charged or not. *See Robinson v. United States*, 878 A.2d 1273, 1289 (D.C. 2005) (citing *Miller-El I*, 537 U.S. at 339).

attention to particular aspects of that evidence. *Miller-El II*, 545 U.S. at 252; *see id.* at 241 n.2 (explaining that the Court itself could conduct side-by-side juror comparisons and analyze "arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles" that were not raised to the state courts because "the transcript of voir dire, recording the evidence on which Miller-El base[d] his arguments" was before the state courts). This totality-of-circumstances inquiry need not be overly complicated or time consuming, but it must subject the proffered reasons for the challenged strikes to sufficiently rigorous scrutiny to "produce actual answers." *See Johnson*, 545 U.S. at 172. Anything less would unconstitutionally elevate "the right to challenge peremptorily" to the detriment of "the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment." *See Batson*, 476 U.S. at 107 (Marshall, J., concurring) (quoting *Swain v. Alabama*, 380 U.S. 202, 244 (1965) (Goldberg, J., dissenting)); *Tursio*, 634 A.2d at 1211 ("[U]nless the trial court rigorously scrutinizes the prosecutor's race-neutral explanations, *Batson*'s promise of eliminating racial discrimination in jury selection will be an empty one.").

The government expresses concern that this affirmative duty of trial courts to assess the persuasiveness of a striking party's race-neutral reasons based on all available relevant evidence will (1) unfairly require the striking party to "guess in advance" what issues might be raised on appeal, and (2) inappropriately transform

trial courts into "advocate[s]." One answer to these concerns is, of course, that the Supreme Court's holdings on the matter are binding, regardless of parties' views about the consequences. But these concerns are also off base. On the first point, where a trial court fulfills its duty to explain relevant available evidence as to the likelihood that a race-neutral reason is pretextual, then the striking party will, in fact, be on fair notice of all relevant arguments against the strike. Only where the trial court fails to fully perform this duty would a relevant factor be newly discussed on appeal. On the second point, far from turning judges into advocates, this affirmative duty to ferret out likely pretextual reasons for striking jurors based on race reaffirms judges' control over the procedures and evidence wielded in their own courtrooms. A trial judge performing an affirmative duty in this regard does what judges are asked to do every day in many other contexts.[5] And this duty to scrutinize a striking party's proffered reasons extends not merely to the prosecution but to criminal

---

[5] These other contexts include bench trials, *see In re J.A.*, 601 A.2d 69, 76 (D.C. 1991) ("[A] judge has 'not only the right but the duty . . . to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case.'" (alteration in original) (quoting *Womack v. United States*, 350 A.2d 381, 383 (D.C. 1976))), and determinations of the admissibility of expert testimony, *see Motorola Inc. v. Murray*, 147 A.3d 751, 754, 757 (D.C. 2016) (en banc) (explaining that the "trial court's role as gatekeeper" requires it to assess whether a method is "scientifically valid" but does not thereby inappropriately "serve as a replacement for the adversary system" (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)), and Fed. R. Evid. 702 advisory committee's notes to 2000 amendments).

defendants and civil litigants as well; all are equally capable of proffering facially race-neutral but unpersuasive pretextual reasons for discriminating against jurors on the basis of race. *See generally Georgia v. McCollum*, 505 U.S. 42 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

### III.   The Trial Court's Errors

We now turn to whether the trial court fulfilled this affirmative duty to scrutinize the prosecutor's race-neutral explanations in light of all relevant available circumstances. We conclude that the court here, like the trial court in *Flowers*, perfunctorily accepted the government's representation and failed to delve into any of the "relevant circumstances . . . bear[ing] upon the issue of racial discrimination." *See Flowers*, 588 U.S. at 302. As explained in more detail below, the trial court's error appears to stem at least in part from it having conflated *Batson*'s step two— which merely requires the prosecutor to proffer a facially valid race-neutral explanation for the strikes—with step three—where "the critical question" is "the persuasiveness of the prosecutor's justification." *Miller-El I*, 537 U.S. at 338-39; *see also Purkett v. Elem*, 514 U.S. 765, 768 (1995).

Specifically, the trial court declined to consider several relevant factors important to determining the force of the proffered race-neutral reasons here. First, the trial court did not consider statistical evidence or—as defense counsel called it

at trial—"the totality of the selections," and instead addressed each strike in isolation. In doing so, the court overlooked strong evidence of racial bias: That the prosecutor initially chose to strike all six nonwhite jurors significantly reduces the likelihood that any one strike was race neutral. Where "[h]appenstance is unlikely to produce th[e] disparity," a proffered race-neutral reason is more likely to be pretextual. *Miller-El II*, 545 U.S. at 241 (quoting *Miller-El I*, 537 U.S. at 342); *see also Tursio*, 634 A.2d at 1213 ("As the actual number of strikes used against one race deviates further from the statistically expected result, a racial consideration—intentional or not—is more likely to be the true consideration behind the strikes.").[6]

The statistical evidence here was compelling. As Mr. Smith states—and the government does not dispute—the "[p]robability of randomly eliminating 6 out of 6

---

[6] Judges are directed to apply such common-sense statistical logic in other legal contexts as well. *See, e.g.*, *Huddleston v. United States*, 485 U.S. 681, 685-86, 691 (1988) (holding that, in assessing whether there was sufficient evidence for prior bad acts to come in to prove knowledge, "the court . . . was required to consider not only the direct evidence" with respect to each individual prior act, but also the other instances too, because "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it" (quoting *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987))); *United States v. Veysey*, 334 F.3d 600, 601-02 (7th Cir. 2003) (Posner, J.) (noting that evidence of multiple instances of defendant losing wives and girlfriends to various house fires and filing insurance claims could be admitted in one joint trial to "show[] intent, modus operandi, and the scope of the scheme to defraud"); 22B *Wright & Miller's Federal Practice and Procedure* § 5247.1 (2d ed. & 2025 Supp.) ("The doctrine [of chances] embodies the idea that the more often an event occurs, the more likely it was produced by deliberate human activity and the less likely it was a chance occurrence.").

nonwhite persons from a pool of 36 persons with 11 selections" is "1 in 4,216," or about 0.02%.[7] Such "total or seriously disproportionate exclusion" of jurors, *Batson*, 476 U.S. at 93 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)), is a red flag that, in other cases, we have described as imposing an "especially heavy burden" on the striking party to persuade the judge that the reasons for the strikes are not pretextual, *Tursio*, 634 A.2d at 1213. This readily apparent statistical oddity should thus have been incorporated into the trial court's determination of pretext.

The trial court also gave no indication that it weighed the racially charged nature of the case. The government itself referred at oral argument to "the sordid

---

[7] The government argues that the strikes of the Asian and Hispanic jurors are irrelevant because "counsel affirmatively narrowed his challenge to 'just the four' Black jurors." While it is true that defense counsel did not continue to pursue his challenges to the strikes of the Asian and Hispanic jurors, the record does not demonstrate that defense counsel expressly limited his challenge either. When the trial court asked if, "[i]n order to support" his prima facie case he "group[ed] the one Hispanic and the one Asian American in order to come up with six," defense counsel asserted that he "believe[d] with just the four individuals it would stand." Counsel thus indicated not that the strikes of the Asian and Hispanic jurors were irrelevant to the *Batson* challenge, but that the government's striking four jurors of one race was sufficient to establish a prima facie case. Even if counsel did affirmatively narrow his challenge, though, the fact of the strikes remains a part of the totality "of the circumstances that bear upon the issue of racial animosity [that] must be consulted" at step three of the *Batson* analysis. *See Snyder*, 552 U.S. at 478; *United States v. Stephens*, 421 F.3d 503, 513-15 (7th Cir. 2005) ("The exclusion of nearly all persons of color from the trial of an African-American defendant looks no less suspicious to the community as a whole because the prosecutor targeted all persons of color rather than solely those of one ethnicity.").

history of racism in connection with rape charges," especially when there is a Black male defendant accused of sexually assaulting a white woman. *Cf. Olden v. Kentucky*, 488 U.S. 227, 230-31 (1988) (acknowledging various racially charged aspects of another case involving a Black man accused of sexually assaulting a white woman). Moreover, this aspect of the case—and the defense theory of consent— were fully known to the parties and court during jury selection. But the trial court itself never mentioned this factor or addressed its effect on the *Batson* analysis.

Nor did the trial court meaningfully consider the extent to which the voir dire record buttressed or undermined the plausibility of the prosecutor's purported race-neutral reasons for the strikes. Take, for example, the prosecutor's assertion that she struck Juror 683 (the DPW employee) for inaccurately answering a question about employment. During voir dire, the trial court asked the venirepersons:

> Has any member of that group, you, yourself, members of your immediate family, close personal friends ever worked for any local state or federal police force, investigative agency or Department of Corrections? Has any member of that group worked for any local, state or federal prosecutor's office, any local, state or Federal Court system, any defense attorney or defense investigator or participated in a neighborhood watch program such as Orange Hats?

Juror 683 apparently understood the question to be asking if he worked "for state or local" government, and because he worked for the local D.C. government at DPW, he mistakenly answered "yes." While an incorrect answer to a voir dire question

could, under some circumstances, reasonably inform a party's decision to strike a juror, the trial court had a duty to "assess the plausibility of that reason in light of all evidence with a bearing on it," *Miller-El II*, 545 U.S. at 252, beyond simply accepting the prosecution's explanation (that the mistake "was not showing a level of understanding of even that fairly basic question") at face value. Even a minimal probing of that explanation would have considered, for example, the fact that the voir dire question was a lengthy compound question that might have confused a reasonable venireperson trying to be as forthcoming as possible about any connection with the government. The court also did not conduct a "side-by-side comparison[] of black prospective jurors who were struck" by the government—like Juror 683—"and white prospective jurors who were not struck"—like Juror 362— who had likewise mistakenly answered "yes" to the same question but nonetheless made it on to the jury. *See Flowers*, 588 U.S. at 302.

The trial court likewise failed to probe the government's purported reason for striking Juror 238, the plumber's assistant—namely, a belief that a plumber's assistant "would [not] be able to understand the scientific testimony" in the case. The prosecutor gave a similar reason for striking the Black cashier, Juror 245, along with concern for how she was dressed. The trial court's analysis of this reason consisted of noting only that it was, on its face, a race-neutral explanation. But again, "asking whether something is race-neutral is analytically distinct from determining

whether the asserted reason is believable or pretextual," *United States v. Rutledge*, 648 F.3d 555, 560 (7th Cir. 2011), and "[t]he *Batson* framework is designed to produce actual answers"—what matters is not "that the prosecutor might have had good reasons" but "the real reason [the jurors] were stricken," *Johnson*, 545 U.S. at 172 (quoting *Holloway v. Horn*, 355 F.3d 707, 725 (3d Cir. 2004)). A meaningful probe into whether the reason was pretextual would thus have considered the nature and centrality of the scientific evidence in the case, whether white jurors with similar education were struck, and whether the government had questioned that juror or any other juror about their scientific aptitude.[8]

In sum, the record here demonstrates that the trial court failed to engage in the "sensitive inquiry" required for a proper step-three analysis. *See Foster*, 578 U.S. at 501. Instead, the trial court appeared to accept the striking party's explanations because they were facially race neutral, declining even to minimally probe the plausibility of those explanations in light of readily available information. While we recognize that this affirmative duty places a burden on trial courts to ask difficult and potentially awkward questions of the parties about their motivations and about the nature of the case, the Supreme Court has signaled time and again that it is a duty

---

[8] We discuss the full record with respect to these issues below in determining whether the trial court's insufficient *Batson* analysis led to a substantive erroneous ruling. *See infra* at 25-30.

critical to enforcing *Batson* and, in turn, to ensuring the continued legitimacy of jury trials.

## IV.  Remedy

Having concluded that the trial court erred when it conducted an insufficient *Batson* inquiry, we turn to the issue of remedy.  In some cases, an effective remedy could conceivably be a remand to the trial court to augment its step-three analysis with further factfinding and consideration of the full record.  *See, e.g.*, *Tursio*, 634 A.2d at 1213 ("Theoretically, we could remand for the trial court to conduct the kind of probing inquiry required on this record and to determine, after the inquiry, whether the prosecutor rebutted the prima facie showing of racial discrimination."). As in *Tursio*, however, we decline to remand here "for two related reasons"— (1) that the prosecutor's proffered explanations "leave little if any room for amplification that would produce a discernibly non-racial motivation for the peremptory strikes" and (2) that "in any event, it is unlikely that the prosecutor could cultivate h[er] memory at this late date to elaborate further justifications that would credibly refine the reasons already proffered." *Id.*  More than a decade has passed since Mr. Smith's trial.  It is fair to ask whether the vagaries of the appellate process—particularly uncalled-for delays attributable to neither party—should be the basis for precluding further findings.  Yet regrettably, even when a *Batson*

challenge is resolved on a fast track, the passage of time will still often make the appropriate inquiry impracticable. Hence the importance of conducting a thorough review using the right standard in the first instance. Moreover, certain aspects of this record, such as the statistical curiosity of striking all six nonwhite jurors, the racially charged nature of the case, the confusing wording of the original voir dire questions, and the importance (or not) of scientific evidence to the case, would not change with further factual findings. "[U]nder the circumstances here," as in *Tursio*, a remand "would be futile." *Id.*; *see also Snyder*, 522 U.S. at 486 ("Nor is there any realistic possibility that this subtle question"—of investigating pretext—"could be profitably explored further on remand at this late date, more than a decade after petitioner's trial.").

Accordingly, we proceed, as we did in *Tursio*, with determining whether the trial court's procedural error in conducting a deficient step-three *Batson* analysis resulted in a substantively erroneous ruling. *See* 634 A.2d at 1213 (forgoing remand after determining trial court's step-three *Batson* analysis was insufficient and instead reversing conviction because trial court's insufficient analysis resulted in substantively erroneous ruling); *cf. Snyder*, 552 U.S. at 477-86 (conducting comprehensive step-three *Batson* inquiry on appeal after "the trial judge simply allowed the challenge without explanation"); *Lewis v. Lewis*, 321 F.3d 824, 832, 834 (9th Cir. 2003) (holding that the state appeals court erred when it "did not rectify the

trial court's failure to conduct a proper step-three inquiry" by "us[ing] the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors").

The trial court's error will have led to a substantively erroneous ruling if at least one of the challenged strikes was more likely than not "motivated in substantial part by discriminatory intent." *Snyder*, 552 U.S. at 485. In deciding that question, "[a]n appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record." *Flowers*, 588 U.S. at 303. A court that is reviewing a ruling that is a claimed violation of *Batson* must consult "all of the circumstances that bear upon the issue of racial animosity," whether or not the trial court viewed any particular piece of evidence in the first instance. *See Snyder*, 552 U.S. at 478. And although we generally give "great deference" to a trial court's credibility determination, *Batson*, 476 U.S. at 98 n.21, such deference is not warranted where, as here, the trial court did not really engage in step three and therefore made no factual findings on which it could rely in determining the prosecutor's credibility— that is, whether her "proffered reasons [we]re the actual reasons," *see Flowers*, 588 U.S. at 303; *see also United States v. McAllister*, 693 F.3d 572, 580-82 (6th Cir. 2012) ("Had it been apparent that the district court actually engaged in the third step, then its determination would be afforded great deference by this court" but because

the trial court "improperly truncated the *Batson* analysis," deference was inappropriate.). The trial court did not, for example, scrutinize "how reasonable, or how improbable, the explanations" were or "whether the proffered rationale ha[d] some basis in accepted trial strategy." *See Miller-El I*, 537 U.S. at 339.

Reviewing the record, we conclude that it is more likely than not that at least one of the struck nonwhite jurors, and in particular, at least one of Juror 238 (the plumber's assistant), Juror 683 (the DPW worker), or Juror 254 (the cashier), was struck on the basis of race. We start by noting the racially charged nature of the case, *cf. Olden*, 488 U.S. 227, and the exceedingly low probability of all six nonwhite venirepersons being struck by happenstance for race-neutral reasons—evidence we have already discussed in Part III. Even if this were not a racially charged case, the statistical evidence alone would place an "especially heavy burden" on the prosecution to point to persuasive evidence that the strikes were not race-based. *Tursio*, 634 A.2d at 1213; *see also Flowers*, 588 U.S. at 315 (explaining that "the overall context" of the trial, including "the State's decision to strike five out of six black prospective jurors," "require[d] skepticism of the State's strike" of one particular juror).

Rather than bolstering the government's stated race-neutral reasons for the strikes, however, the remainder of the record only reinforces our conclusion that the

reasons are pretextual. As noted in Part III, the prosecution's stated reason for striking Juror 683—that the juror did not understand a "basic" question about government employment—is questionable, given the lengthy compound voir dire question, the likelihood that the juror was simply erring on the side of full disclosure given that the "government" writ large was both the juror's employer and the prosecution, and the fact that the government chose not to strike a white juror who answered the same question incorrectly.

The voir dire record also does not support the plausibility of the prosecutor's purported reason for striking the Black cashier (Juror 254) and the Black plumber's assistant (Juror 238)—that is, that they would be unlikely to understand the scientific testimony in the case, and that such testimony would be important to the case. At the outset, the claim that the case would turn on scientific testimony (and thus that the strike here was "related to the particular case to be tried," *see Batson*, 476 U.S. at 98) is questionable at best. As both parties knew in advance, the disputed issues in the trial were focused on eyewitness credibility, not complex scientific concepts. Indeed, Mr. Smith acknowledged having sex with the complainant during a videotaped police interview and told others that he had had consensual sex with her. Not surprisingly, then, Mr. Smith confirmed in a pretrial hearing before jury selection that he was proceeding on a consent defense. While the government is correct that there was no formal stipulation by the parties to identity or to the validity

of the DNA testing, all indications were that these issues would be ancillary at most to the case, given Mr. Smith's admissions and stated defense.

The only remaining expert testimony arguably central to the case was that of Dr. Peter Wilk, an expert medical witness for the defense. Dr. Wilk testified that an anal fissure and the redness seen in a photograph of the complainant were more likely to be caused by "straining of bowel movement" and "[e]xcessive wiping" than forcible sexual intercourse. While the government is correct that this testimony mattered to the issue of force, we do not see—and the government does not argue—that this testimony was especially lengthy, confusing, or complex—or that a juror would need any particular background at all to understand it. Because the government could not have expected that complex scientific concepts would be central to deciding the case, its purported desire for jurors who could understand such concepts is less probable. *See Miller-El I*, 537 U.S. at 339.

The government's failure to ask any questions of prospective jurors about their education level or scientific aptitude during jury selection further indicates that the desire for an educated jury was likely a pretextual reason for striking Jurors 238 and 254. *See Miller-El II*, 545 U.S. at 246 ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for

discrimination." (alteration in original) (quoting *Ex Parte Travis*, 776 So.2d 874, 881 (Ala. 2000))). Instead, the government focused its questioning on potential jurors' experiences with and views of the criminal legal system—personally, professionally, and through friends and family. The prosecutor asked two attorneys, one former attorney, and one private investigator about their participation in criminal cases, and specifically in sexual assault cases. The prosecutor similarly asked a nurse practitioner if she was involved in sexual assault exams. This question theoretically could have revealed scientific aptitude but, given the context, appeared intended to ferret out whether the nurse would rely on her own knowledge in place of the medical testimony.[9] The prosecutor also asked two jurors—one who had been assaulted and one whose wife had a DUI conviction—about their personal experiences with the criminal justice system. Along the same lines, the prosecutor moved to strike for cause a juror who had won a civil suit against police officers who "falsely accused him of a drug drop and threw him through a window." After her motion was denied, she peremptorily struck the juror. In contrast to this detailed questioning about criminal justice ties, the prosecutor's lack of any questions about education or scientific or technical background further indicates that jurors' aptitude

---

[9] For example, after the nurse replied that her work did not "involve sexual assault exams in anyway [sic]," the trial court further inquired to confirm that the nurse would "listen to the expert witness" and not "pretend to be an expert [her]self."

in that regard was not a particular concern of the prosecution.

Relatedly, the government declined to strike at least two white jurors—a nanny and a nonprofit worker who taught "kids how to read"—neither of whom presumably had any more apparent scientific aptitude than a plumber's assistant or cashier. *See Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ."). The government responds that the nanny may have nonetheless been an attractive juror to the government because a nanny "needs a more compassionate, empathetic disposition compared to workers in many vocational industries" and because the nanny's grandfather was a judge and she had a friend who was a public defender.[10] But the government asked no questions of other jurors about empathy and struck two other white jurors with criminal defense ties. The government also offers no evidence from the record to explain why Juror 362, the children's reading tutor, would be preferred by the prosecution over the struck jurors. Juror 362 is an especially telling comparator because—like Juror 683 (the struck DPW

---

[10] It is not clear to us why the *government* would view a juror's friendship with a public defender as a reason to predict the juror will be favorable to the prosecution. If anything, such a relationship would seem advantageous to the defense, making the government's stated justification appear even more unlikely.

employee)—she mistakenly answered "yes" to the question whether the juror, members of their immediate family, or "close personal friends" ever worked as a prosecutor or public defender. Although the prosecutor insisted the DPW employee's answer signified a disturbing inability to understand "even that fairly basic question," the prosecutor raised no such concerns when a white juror made the same mistake. In any case, whatever differences one might see between a nanny and reading tutor on the one hand and a cashier and plumber's assistant on the other, a white panelist need not be "identical in all respects" to the struck Black prospective juror for a comparative analysis to indicate pretext when "the differences seem far from significant." *See id.* at 247 & n.6. If the trial court had minimally probed these issues, we would have a better record on which to judge these claims. But the comparison we can make on this record does nothing to dispel concerns about pretext.

The government's strikes of Jurors 802 and 721 (the alternate),[11] two nonwhite jurors who actually did have some technical background, cast further doubt upon its purported desire for a highly educated scientifically inclined jury. Juror 802

---

[11] Although the government withdrew its strike of Juror 721, we still consider the initial strike as part of the "entire context of the case." *See Tursio*, 634 A.2d at 1212 (explaining that at step three of the *Batson* analysis, "each challenge" must be assessed "in the entire context of the case . . . to determine why [the government] . . . treated similarly situated black and white persons differently").

was a Hispanic juror who studied project management and administration full time "[a]t ITT Tech"[12] while also working full time at a bookstore café, and Juror 721 was a Black juror who worked in marketing at an information technology company—a profession presumably requiring higher education and some STEM knowledge. Moreover, neither juror answered "yes" to any of the voir dire questions that may have indicated bias, and the prosecutor did not ask either juror any follow-up questions. If there was no apparent race-neutral reason to disfavor these jurors and they both appeared to possess the very quality the prosecution allegedly prized, it is hard to make sense of the strikes of the Black cashier and plumber's assistant as anything other than racially motivated. *See Miller-El I*, 537 U.S. at 339 (at step three, "implausible . . . justifications may (and probably will) be found to be pretexts for purposeful discrimination" (quoting *Purkett*, 514 U.S. at 768)).

Finally, we note that the reasons the prosecution gave for its strikes of white jurors are conspicuously more supported by readily apparent facts and grounded in accepted trial strategy than its reasons for striking all of the nonwhite jurors from the venire. Of the five white jurors struck by the prosecution, four answered "yes" to at least one of the trial court's initial voir dire questions, and those "yes" answers

---

[12] The government's comment that this is a "for-profit technical school instead of a college" does not explain why jurors with no apparent higher education at all were preferable to a juror with some higher education.

prompted the government to engage in further questioning of three of them and to move to strike the fourth for cause. Juror 743 was a former criminal defense attorney who, through the prosecutor's questioning, confirmed that she had worked on rape, robbery, and homicide cases. Juror 603 had described an experience "that left [him with] a really negative impression" of the police. Juror 684 had worked at a firm with colleagues who did criminal defense and personally worked on child molestation cases at a public defender office during law school. Juror 684 also reported that his close friend was a crime victim and his sister had been convicted of several misdemeanors. And the government unsuccessfully moved to strike Juror 491 for cause after learning about his negative experience with the Metropolitan Police Department. The government had a clear reason to believe each of these white jurors held race-neutral biases against the government. In contrast, for example, Juror 238—the Black plumber's assistant—did not answer "yes" to any voir dire questions, and the government did not follow up before striking him.

In light of the compelling statistical evidence, the racially charged nature of the case, and the improbability of the prosecutor's proffered reasons given the side-by-side juror comparisons, we conclude that the prosecution more likely than not struck at least one of the nonwhite jurors based on their race. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, 588 U.S. at 298.

## V. Conclusion

For the foregoing reasons, we reverse Mr. Smith's convictions and remand for further proceedings consistent with this opinion.

*So ordered.*